PORT BLAKELY MILL CO. v. ROYAL INS. CO.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1911.)

No. 1.805.

1. INSURANCE (§ 334*)—POLICY—CONSTRUCTION—WARRANTIES.

Where a fire policy authorized additions, alterations, and repairs without limit of time, and also provided that insured warranted that due diligence should be used that the automatic sprinkler system should at all times be made in good order, insured was only bound during the making of repairs to its mill and sprinkler system to use due diligence to maintain the system in good working order.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 847–855; Dec. Dig. § 334.*]

2. TRIAL (§ 139*)—DIRECTION OF VERDICT—EVIDENCE.

In an action at law on a fire policy, the court was not authorized to withdraw an issue as to whether plaintiff had used due diligence to keep its sprinkler system in good order from the jury, and direct a verdict for defendant, unless plaintiff's evidence considered in its most favorable light was such that all reasonable men must draw therefrom the conclusion that plaintiff had not used due care.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. § 139.*]

3. INSURANCE (§ 668*)—SPRINKLER SYSTEM—MAINTENANCE—QUESTION FOR JURY.

In an action on a fire policy, evidence held to require submission of the question of plaintiff's due care in maintaining its sprinkler system in working order to the jury.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 668.*]

In Error to the Circuit Court of the United States for the Northern Division of the Western District of Washington.

Action by the Port Blakely Mill Company and another against the Royal Insurance Company. Judgment for defendant, and plaintiff Mill Company brings error. Reversed and remanded.

Titus & Creed, Walter S. Fulton, and Hastings & Stedman. for plaintiff in error.

H. T. Granger and E. C. Hughes, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ROSS, Circuit Judge. This was an action upon a policy of fire insurance to recover for a loss sustained by the plaintiff in error, the Port Blakely Mill Company, a corporation, which was plaintiff below, by the burning of a portion of the sawmill plant owned and operated by it at Port Blakely, in the state of Washington. Upon the conclusion of the plaintiff mill company's evidence, the trial court, on motion of the defendant company, directed a verdict in its favor, which was accordingly returned. Judgment followed against the plaintiff mill company, which brings the case here upon writ of error.

The printed portion of the policy contained a provision to the effect that it should be void if the plaintiff's plant should be operated at night later than 10 o'clock, or if its operation should be suspended for more than 10 consecutive days, or if mechanics should be employed in altering or repairing the plant for more than 15 consecutive days, or if certain prohibited materials should be kept upon the premises; but those provisions of the printed portion of the policy were modified by the following provision, prepared by the plaintiff's insurance broker, and inserted in the policy by mutual consent of the respective parties thereto, to wit:

"Privilege to make additions, alterations, and repairs, and to deplete without limit of time * * * to work overtime and at nights, to do such work and keep and use such materials and products as may be incidental to the business, any prohibition of the same contained in the printed conditions of this policy being waived."

It is not disputed that by virtue of the clause just quoted the assured was entitled to make additions to the plant, alterations therein, and repairs thereto, without regard to the printed portions of the policy, and could operate the plant throughout the night and employ such mechanics and do such work and keep such materials upon the premises as it desired, and as were incidental to the prosecution of the business in which it was engaged; and, as its sprinkler equipment was by the policy expressly made a part of the machinery insured, it is conceded that the assured was entitled, under the policy, to make any additions to the sprinkler equipment, and such extensions and alterations thereof and repairs thereto as it might desire, all of which concessions, however, are coupled with this other provision of the policy:

"Warranted by the assured that due diligence be used that the automatic sprinkler system shall at all times be maintained in good working order."

As a matter of course, if in making additions to or extensions of the plant or alterations therein permitted by the policy it became necessary to move or disconnect the sprinkler system or any part thereof, it could not in the nature of things be kept in good working order during the time of temporary suspensions for those purposes, and therefore in the nature of things it could not be maintained in good-working order "at all times." The clear meaning of the clause relied upon by the defendant in error therefore is in our opinion this: Warranted by the assured that it will use due diligence to maintain its automatic sprinkler system in good working order.

Did the assured use that required diligence was the real question in the case. The trial court refused to submit it to the jury; itself de-

ciding the question as a matter of law against the plaintiff. To test the correctness of the court's action, we have therefore to consider the evidence introduced by the plaintiff.

The evidence showed that the mill in question is 450 feet long by about 100 feet in width. The sprinkler system was installed by the company for the purpose of extinguishing fire, should it occur. Water therefor was supplied by reservoirs owned by the company. The system was divided into divisions, those numbered 3, 4, and 5 covering that portion of the mill plant comprising the mill building, in the eastern part of which was the lath mill. Each division was connected with the supply pipes leading from the reservoirs by a large vertical pipe, called a "riser." Lateral pipes containing sprinkler heads were extended from each riser over the area intended to be covered by its division of the sprinkler system. Until a fire occurred, the water supply was usually kept out of the lateral pipes by means of the air pressure, which closed and held down the gate in an automatic air valve placed in the riser; the operation of the system being that, upon the happening of a fire, such fire would fuse and melt the sprinkler heads, thus releasing the air pressure and opening the air valve, thereby permitting the water to flow from the riser into the lateral pipes and out upon the fire through the sprinkler heads. In each riser immediately below the air valve there was a gate, operated by hand, by means of which the water supply in any division could be shut off.

In its answer to the plaintiff's complaint the defendant company set up affirmatively that on or about April 1, 1907, the plaintiff caused the gate valve in division No. 3 of the sprinkler system to be closed and the connecting pipes to be removed, thereby wholly cutting off the water from that division, and that the plaintiff "carelessly and negligently and without the exercise of due diligence" caused and permitted division 3 of the sprinkler system to remain in the condition last above indicated without water, and useless as a means of fire protection, from April 1, 1907, continuously until after the fire on April 22, 1907. The record shows that the fire occurred in the night of the day last mentioned, which was Monday, in that portion of the plant covered by division 3 of the sprinkler system. In its reply filed to this affirmative defense the plaintiff mill company put in issue the averments of negligence and lack of due diligence on its part, and also denied that division 3 of its sprinkler system was without a supply of water at the time the fire occurred. It further set up that on or about April 1, 1907, its business required that additions, alterations, and repairs be made to that portion of its mill building known as the lath mill, and also to division 3 of its sprinkler system, in order to make it more effective and to extend it to the lath mill, and that accordingly, and in conformity with the conditions and provisions of the policy in suit, the plaintiff proceeded with the execution of that work, and as expeditiously and rapidly as possible; that it could not be performed without turning off the water from division 3 of the sprinkler system; that on April 21, 1907, the work had been so far completed that the water could be and was on that day turned into division 3, which was the earliest time possible, and that at the time of and during the fire in question division 3, as well as all other divisions of the sprinkler sys-

tem, was in good and thorough working order; and that the plaintiff mill company had at all times used due diligence to maintain the whole of its said sprinkler system in good working order at all times.

There was evidence on the part of the plaintiff mill company to the effect that one Ford, a man experienced in the construction and operation of sawmills and sprinkler systems connected therewith, was appointed superintendent of the plaintiff mill company's sprinkler system in March, 1903, and was such superintendent continuously to the time of the fire in question. His testimony is to the effect that he was instructed by the general manager of the mill company, who appointed him, to make a thorough investigation of the system, and order all necessary supplies to keep it in good working order, all of which he did. He explained in his testimony the details of the system, its different supplies of water, its various connections and laterals and its operation, and testified, in substance, that the company had a full crew of properly qualified men with which to keep the system in good order, who worked upon it continuously, and kept the system in good order; that the company kept in stock everything necessary to keep the system in good working order, and that he personally made an examination of some part of the system each day; and that he had a daily conference with the general manager in respect to the sprinkler system and its condition. The general manager, Mr. Eddy, testified to the same general effect, saying, among other things:

"When I became general manager of the Port Blakely Mill Company, I placed Mr. Ford in charge of the sprinkler system, and from the time he arrived at Port Blakely in 1903 until the time of the fire he was continuously during that time in charge. My instructions to him, when I placed him in charge of the sprinkler equipment, were that he should spare no expense and use every care in keeping the sprinkler system in good working order. These instructions were given almost daily. For maintaining the sprinkler equipment from January 1, 1907, down to and including the night of the fire, we had the dams and the pipes, and we had a machine shop there, and a large amount of pipe fittings and sprinkler heads, and all the necessary material for the usual repairs and up-keep of a sprinkler system. All the time we have been there we have maintained such a supply of pipes for the sprinkler equipment. I had four or five different ways of checking to determine whether or not my instructions regarding the maintenance of the sprinkler system were carried out. I made daily trips through the plant myself, personal inspection of them. I had daily conferences with Mr. Ford, both at our regular meeting time at 6 o'clock, and also when I went into his office. The foreman and superintendent met me in my office at 6 o'clock. Then the insurance companies sent men there to examine before they took our risks. I presume these men were experienced sprinkler men, and they generally came into my office and asked permission to go through. I would talk with them, and either go with them myself, or ask some man to go with them and show them the location of these different valves and parts of the system, and asked them to see me before they left, because I wanted to talk with them and get their ideas. Then the Washington Insurance Survey, or Company, of Seattle, have a man that is supposed to come there two or three times a month, and they send you regular reports after the examination. Besides, I would talk with them before they would go away. They came over to Port Blakely. I think that is about all of the various ways I have of ascertaining whether the work was kept up."

The evidence showed that in the early part of 1907 the lath mill had to be and was rebuilt, and that division 3 of the sprinkler system

had to be and was extended into the new lath mill. The superintendent, Ford, testified that he superintended the moving of it, and that at the time he had all the equipment he had referred to in his testimony.

"The fire occurred," said the witness, "a little before 11 p. m., April 22, 1907. Mr. Baird, from the Washington Insurance Association, and Mr. Miller made inspections of the sprinkler system just a short time before the fire. They are not connected with the mill company. Their inspections were made in January, or possibly in February. The plant was practically in the same condition at the time they made their inspections as it was at the time of the fire. Previous to the fire we rebuilt the lath mill. It was necessary to almost rebuild the plant. We put in new sills, spliced out the posts, took two sections of the northerly end of the building out, put in new shafting, and modernized the mill all the way through. System No. 3 of the sprinkler system, in the east end of the mill, covered the lath mill. The lath mill was in the northeast end of the mill, and was a substantial building, 12 by 12 by 16 timbers. We rebuilt the lath mill. In making the sprinkler repairs, the crew consisted of two men. At different times, when I could use them, I had as high as five or six. When we worked on the lead work, or changing the cast iron pipes, or when I could use lead men, I used them. I used from five to six men in changing the system. The changes in the sprinkler system commenced in the fore part of April, and were completed the Sunday before the fire. That would be the 21st. The fire occurred on Monday night. In making the change, while we worked lead work and changing the cast iron pipes, I think I had six men at one time and five part of the time. We had to change the location of the water main. As it came into the mill it formerly turned to the south, and the air valve stood inside of the main mill, and, after we had changed the lath mill, our main driving belts that were on the lath mill ran so close to the air-valve that we were forced to move it. We moved it north there about nine feet, a short distance into the lath mill. We were not able to work in making these changes and repairs when the mill was running on account of the belts, shafting, and pulley running in such close quarters there. The lives of the laborers would have been in danger, so that the only time we could work was when the mill was closed down. I examined the work on Sunday afternoon before the fire, and again on Monday morning. From my personal observation it was completed. I am able to say that. * * * I was present at the time the gate valve was removed from system No. 3. The valve at that time in the ruins was nearly open. It laid at an angle. It was not laying at what I would call flat. I should say an angle of about 30—I don't know—as much of an angle as 45. It lay on an angle leading toward the south. I recognized it as the air valve in No. 3. It laid in the ruins there for some time, until we commenced to take it apart. It was not disjointed at the time I first saw it, but I was present when it was disjointed. It was disjointed by a man by the name of Vatten, and he had another man there helping. I don't know the other man's name. Olson was there, three or four of those. Vatten was the man that finished it, taking the flanges apart. I told the men to move the gate valve west toward what remained standing of the fireroom. We moved it west of the lath mill towards the fireroom. It was disjointed right where it fell. I was present at the operation of disjointing and separating that valve, and saw them take it out. I found the valve nearly open, the gates lacked about an inch and a half of being wide open. The width is six inches. With the valve open, the water would be on. From my examination of this valve, made when it was disjointed, I could tell it was open at the time of the fire from the condition of the valve. The top seat of the valve is dropped down over a quarter of an inch. It is a gate valve; a Scott valve. If the valve had been closed, it would have been impossible for that top seat to have left its position, because a valve is made wedging. When they are closed, they wedge in there solid. It would have been impossible for the seat to have left its position with the gate valve closed."

The witness Ford also gave this further testimony:

"I could not say just how many days it was after I started to make the changes in the lath mill that the water was turned off from the sprinkler system. It was after the work had been pretty well in progress. To disconnect it we had to shut off the water at the gate valves and disconnect a pipe that screwed into this main pipe that you spoke of that paralleled the mill, disconnect that pipe, and screw in a plug in place here, put an air pressure on, open the valve again, and then the water was on the east end of the mill, everything excepting the lath mill. We disconnected the two-inch pipe, put in a two-inch plug, that disconnected the sprinkler system from the lath mill, which we were rebuilding. We screwed in a two-inch plug into that pipe and proceeded to put the water on. This pipe came out in the old mill at that part of the riser which was close to the floor. The two-inch pipe extended from there up to the upper floor, and also along beneath the upper floor so as to communicate with the lower floor, and from the same opening. One with a connection we call a tee—a short nipple and a tee going up into the upper floor of the lath mill, and the other extending out between them.

"Q. How long after that was it until you had occasion to change the location of the dry-pipe valve, this valve we are speaking of here, which is known, as you located it, at No. 3 on this diagram 'H'? A. We commenced the work on that after we had started the lath mill, which we started up the 1st day of April, or about the first of April.

"Q. Didn't you do that on the Sunday before it occurred, just before that? A. The changing of the pipe?

"Q. Yes. A. No; we did that before—well, we ran the lath mill for several days, wearing the bearings down before putting in a crew to do a day's work. Before we put in a crew to run full time we made them changes. I don't think we made that change on a Sunday. I would not be positive what day that was done on. We did that the very first of April—fore part of April. We didn't shut down the sawmill to do that. We could move that lower pipe with the lath mill shut down without shutting the sawmill down. There was nothing with the sawmill part to interfere with the work, unless you came below the sawmill floor, and that part was below the sill of the sawmill floor. The machinery of the sawmill was overhead.

"Q. The dry pipe was not overhead? A. You are speaking of the main leading to the dry pipe?

"Q. You moved the riser and the dry pipe itself about nine feet, didn't you? A. Yes, sir; and we just had to move the water main that the dry pipe is connected to, that the riser rises up to.

"Q. But you had to take out the connection from beneath the gate valve—took out the gate valve and the dry pipe valve, and took the riser above—took that out and moved them all over about nine feet? A. No.

"Q. What did you do? A. We just disconnected the air valve where it stood, hammered the lead out of the cast-iron pipe that was in the ground, turned the elbow—the elbow was originally facing south—turned the elbow over headed northward, took a piece of pipe out, and moved the air valve over and set it on there.

"Q. You disconnected the riser that came up from the elbow below? A. Yes, sir.

"Q. You had to disconnect the gate valve, and disconnect the dry-pipe valve. You would have to disconnect that to set it on top of the dry-pipe valve that went up to the pipe above? A. Not necessarily.

"Q. You did do it? A. We did it later on.

"Q. You did that when you moved it over? That is, what I am trying to get at? A. We didn't do all of it when we moved it over. We just moved to the top of the air valve, onto the top of this here, is what we moved first.

"Q. You didn't put all the risers back on top of the dry-pipe valve? A. No, sir.

"Q. But, before you could move the dry pipe valve, you had to take the riser off and disconnect it? A. We disconnected it; yes, sir.

186 F.—46

"Q. So you took off the riser before connecting the dry-pipe valve with the pipe overhead? You took off that and had to plug it up above? A. Yes, sir.

"Q. Then you separated the dry-pipe valve from the gate valve, and then you separated the gate valve from the riser pipe below? A. Yes, sir.

"Q. And took off that riser pipe, and then turned the elbow and that brought it around to that, and over the other way? A. Yes, sir.

"Q. And put a piece of pipe on the end of it? A. Yes, sir.

"Q. You put on that riser pipe to bring it above the floor, then you put your gate valve on top of that again, then you put your dry pipe valve on top of that? A. Yes, sir.

"Q. That was all you did on that Sunday? A. Yes, sir.

"Q. That was along about the 1st of April? A. Yes, sir; the very fore part of April.

"Q. How long did it take you to do that work? A. We did the lead work —we shut off the water in the morning, and had it on that evening again.

"Q. That would be, according to Mr. Tobin's statement, about half past 2 that afternoon? A. Some time during the day.

"Q. From 10 o'clock until half past 2. Why didn't you go on and put the riser on top of it, and connect it back so that it would supply the east end of the mill? A. We didn't have the time that day, and we had to prepare the fittings.

"Q. What? A. The connections for connecting it up.

"Q. What were they? A. They consisted of cutting the pipe, fitting the elbows, 45 tee. The day following the moving of that pipe, or the night following the moving of that pipe, the line broke. It broke three times before we got it up.

"Q. You had to fix that the following night? A. Yes, sir.

"Q. But that had nothing to do with working on this? A. It had everything to do with working on that. It was part of that pipe.

"Q. You had to repair that? A. Yes. sir.

"Q. You could not work on this while you were working on that. Of course, that would not furnish water until it was fixed? A. Oh, no.

"Q. What I am trying to get at, in putting some other pipe onto this pipe, you have shown what you disconnected when you moved it from the place inside of the mill on the north side of the mill, nine feet north to a place inside of the lath mill. It is shown that you disconnected all these pipes that connected with the pipe, then turned the elbow over, and added the necessary piece or two to bring it over the proper distance into the lath mill, put on the riser, put on your gate valve and then put on your dry-pipe valve. There remained to be done what to complete the connection back again with the pipe from which you disconnected it to supply water to that system— tell us what? A. It needed to be taken the measure of it—making a sketch of it, having the fittings cut and put to place—put in and connected up.

"Q. We will suppose this pipe has been moved from this point? A. Yes, sir.

"Q. When it stood at this point, there was a riser that carried it up and connected it with the main east and west pipe that ran below? A. Paralleling the mill.

"Q. Just below the second floor? A. Directly over it.

"Q. Now, when you changed the connections below and carried it over nine feet above, you had to have the top of this dry-pipe valve that stood over these pipes, how high? A. I should say six feet.

"Q. Then you would have to have elbows? A. Then have to have a tee.

"Q. A tee? What for? A. To take out the main for sprinkling the lath mill. A tee is a 6 by 6 by 6. It is a cast-iron connection; a round piece of pipe with three openings. A pipe can be taken off from it. Above that is a short nipple—that is, a short straight piece of pipe about five or six inches long, for the purpose of getting the requisite height. On top of that is another short piece of pipe carried over from there, and then a 90-degree elbow. Then, on the end of that pipe, it was carried from this location back to a point underneath the overhead pipe. We had to drop down. We put it in above that and dropped down to the pipe paralleling the mill. The pipe that was carried from the new location, when it was finally put onto the dry-pipe

valve, ran up and ran high enough so as to cross over up above the main east and west top of the mill proper, and had to be dropped back down. After moving this dry-pipe valve on the 1st of April over into the lath mill, the dry-pipe valve was left in that location without connecting it up. In order to make that connection complete and supply water to the No. 3 system, it was necessary to put on the pipe and fittings and elbows we have just described, and that generally would have completed the sytem so as to carry water to the No. 3 system. It was some two or three weeks before moving this dry-pipe valve from the sawmill proper to the lath mill proper that it was determined that the change would have to be made. The change had to be made for the reason that the belt ran so close—the main driving belt for the lath mill—ran so close it ran almost under the cone-shaped part of the dry valve. The belt shown on Exhibit H don't cut any figure. That was on the old lath mill. For the new lath mill it was altogether different. New power and new belting had to be put in for running the additional machinery that was put into the new lath mill. When we installed and commenced trying the lath mill, two or three weeks earlier, we found that the belts ran too close to the dry-pipe valve as it was originally located to make it work safely or conveniently. It would have remained there, but, in order to protect it from the frost, we had to have a house around it. We could not have a house around it in that location. We knew it would have to be done, and we allowed it to remain intact just as long as we possibly could, in order to leave the sprinkler system intact as long as we possibly could. That was one of the reasons why we delayed it.

"Q. (Mr. Hughes.) I asked you what you gave as a reason why you didn't go on and finish it on this Sunday, or that night, or the next day? A. We possibly did all it was possible to do at that time; that is, that day.

"Q. Why didn't you do it that night, or the next day? A. We went to sleep that night.

"Q. Why didn't you do it that next day? A. We worked all the next day, all we could. The next day the lath mill was running.

"Q. Why didn't you go on and do it? A. Why didn't we do it?

"Q. Yes. A. Men, like everybody else, get tired, I suppose. If they do a day's work, they want rest.

"Q. When you commenced to do this again, was it on Sunday, the 21st of April? A. Oh, no, no; we commenced working on it the next morning.

"Q. You mean you commenced— A. Yes, sir; commenced moving the pipes, and making preparations and repairing the other breaks.

"Q. That was an entirely different matter, separate from this. That was not connected with the removal of this. A. They were connected with that valve there.

"Q. I am talking about this particular work of changing back. When did you first get out that pipe to see what pipes and elbows you had that would be sufficient to connect this back again with the main No. 3 system? A. The very next morning after I got it located—after I got it in its permanent place, the very next morning I commenced.

"Q. Assuming this was on the 1st and 2d, you say you worked the next morning? A. Yes, sir.

"Q. What did you do then? A. I took my measurements, made a sketch of it, went and looked the fittings over to see if we had ample fittings.

"Q. What did you find out? A. I found out that we had.

"Q. Found out that you had? A. Yes, sir.

"Q. What did you do after that? A. We kept after it every time we could work at it.

"Q. Tell us what you did. A. I am trying to tell it to you. If you can tell it faster than I can, go ahead. We kept at it when we got working at it. We went and took our measurements, got the pipe together, and assembled them. When I put on a 45, I found a little latent defect. That was when I put it together, possibly the fore part of the week, maybe Tuesday or Wednesday. I then ordered from Crane & Co., some time in the fore part of April. I think the day that we got around to put it together was reported to me on the 11th or 12th. I made the order on either Thursday or Friday morning, and wrote right across the face of the order, 'Please rush this order.' I don't

think I sent the order on the 14th. I think my order was dated on the 12th. I ordered by telephone, and confirmed it the day following with a written order. [Witness was here shown a carbon copy of the order.] I ordered by telephone and confirmed it with a written order on the day following, April 13th. The order came back in the fore part of the week following. I don't think it was Monday, the 15th, but that it was Wednesday, we got it. It was some time during the fore part of the week. We had all of those documents some place showing when it was received. I have the bill received from Crane & Co. The shipping bill is in the exhibits somewhere. We didn't receive it until some time during the fore part of the week. I couldn't tell as to dates, whether Sunday was the 13th or 14th, but it seems to me—I am almost positive I ordered on Thursday, and followed it with a written order on Friday. If, as a matter of fact the written order bears date the 13th, which was Saturday, I don't know whether the order was made on Saturday. I would not say it was. The work of setting up the riser in the dry-pipe valve, and putting on the tee and the nipple and the elbows, and making the connection back to the No. 3 system, was done by Mr. Olson and Mr. Casperson. Mr. Olson was not in charge of the sprinkler department. He was boss of the crew. I looked to him for to complete the work—to do the work—and Mr. Casperson was his assistant. They went to work putting it up on Sunday morning, the 21st, and worked at it all day Sunday until 5:30. Olson and Casperson did the work. I helped them. I gave them a hand to pull the pipes over the timbers. The long pipes had to be assembled and put in position, and flanged on each end, as there was no chance to screw pipes in these timbers. Consequently they had to be assembled where we could work at them, pulled together and in through the timbers. We could not set them up when the mill was going. That was the reason why we did not set them up earlier because the mill was running day and night except Sunday. That was why we waited until Sunday. On Monday morning I noticed that the pipes had been set up and connected, connecting up the dry-pipe valve from its new location over to the pipes in the old location in the mill. I didn't try the valve, or make any test to see whether the system was in operation at any time after the 1st of April and before the fire. It was just connected up the Sunday before the fire. I passed through on Monday morning. I did not go and open the valve and try the valve. I saw that everything, as far as I could see, was intact. The pipes were on and bolted together. I saw the valve in the No. 3 system, the gate-pipe valve, possibly the day following the fire. I made an examination of it possibly two or three weeks after. I never made an examination of it until it was disconnected. In the next place, no man could make an examination of it until it was disconnected."

We think enough of the testimony has been set forth to show that the question as to whether the mill company used due diligence to keep its sprinkler system in good working order was for the determination of the jury, and that the trial court was in error in directing a verdict for the defendant insurance company. In such cases that course is justified only when the plaintiff's evidence is such that it can be fairly said that all reasonable men must draw the same conclusion from it. The authorities to this effect are so numerous that it is unnecessary to cite them. The law also is that in passing upon a motion to take a case from the jury it is the duty of the court to take that view of the evidence most favorable to the party against whom a directed verdict is asked. Janoski v. Northwestern Impr. Co., 176 Fed. 215, 99 C. C. A. 569, and cases there cited.

That reasonable men may differ as to whether the facts testified to in the present case show that the mill company used due diligence to maintain its sprinkler system in good working order as required by the policy in suit is well illustrated by the case of the same mill com-

pany against the Springfield F. & M. Insurance Co., reported in 56 Wash. 681, 106 Pac. 194, 28 L. R. A. (N. S.) 593, and in (Wash.) 110 Pac. 36, in which case the policy in suit, in so far as the question here involved is concerned, was identical in terms, in which the same fire was in question, and in which the plaintiff's evidence in respect to the question of diligence seems to have been substantially the same as that presented in the present case, and where it was held by at least some of the judges of the state of Washington that it showed the exercise of due diligence in the matter in question on the part of the mill company.

The judgment is reversed and cause remanded to the court below for a new trial.